**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| Susan Edge,                 ) | |
|                   ) | |
|      *Plaintiff*,        ) | |
|                   ) | Case No. 15 CV 50292 |
| v.                    ) | |
|                   ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill,[1] Acting   ) | |
| Commissioner of Social Security,   ) | |
|                   ) | |
|      *Defendant*.      ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Susan Edge brings this action under 42 U.S.C. § 405(g), seeking a remand of the

decision denying her social security disability benefits. For the reasons set forth below, the

decision is remanded.

**I. BACKGROUND**[2]

In January and March 2014, Plaintiff filed applications for disability insurance benefits

and supplemental security income. Plaintiff alleged a disability beginning on January 1, 2012,

because of bipolar disorder, brain aneurysms, dissection of the aorta, chronic back pain and

depression. R. 72.

On October 8, 2013, Plaintiff went to Crusader Clinic complaining of depression and

anxiety and was referred to Kimberly Mattei, APN. R. 327-28. Plaintiff reported taking

multiple antidepressants, but felt "little relief." R. 324. As a result, Nurse Mattei referred

Plaintiff to psychiatrist Dr. Zaffar Rizvi on October 10, 2013, for an evaluation of her depression

and anxiety. R. 305. Dr. Rizvi diagnosed Plaintiff with bipolar disorder. R. 305. From

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant for
Carolyn W. Colvin.
[2] The following facts are only an overview of the medical evidence provided in the administrative record
and focus on Plaintiff's mental health issues in light of the concerns addressed in this appeal.

October 2013 until January 2014, Dr. Rizvi prescribed increasing doses of Trileptal, Latuda and Trazadone to relieve Plaintiff's depression, agitation and anger. R. 301-05. At the January 2014 visit, Dr. Rizvi did not schedule another appointment, but instead instructed Plaintiff to follow-up with Nurse Mattei. R. 302.

While treating with Dr. Rizvi, Plaintiff continued mental health counseling with Nurse Mattei. On October 16, 2013, Plaintiff reported symptoms of depression since she was young, but has felt much more depressed since she was terminated from her job in 2011. R. 322. On December 17, 2013, Nurse Mattei reported that Plaintiff had a better mood. R. 318. On January 29, 2014, Plaintiff reported feeling very depressed, was not eating, sleeping or doing self-care and admitted that she ran out of Trileptal the week before. R. 316. Nurse Mattei believed the lapse in medication could explain Plaintiff's abrupt change in mood. R. 316. On February 7, 2014, Plaintiff reported "good days and bad days," noting continued strained relationships with her family, but she was still able to socialize with friends sometimes. R. 314. On February 18, 2014, Plaintiff reported that she was moving to Texas to work on her marriage. Nurse Mattei stated her concern about Plaintiff's "continued symptoms of depression. [Plaintiff] has been on all the antidepressants." R. 312. Nurse Mattei provided a 90-day prescription to give Plaintiff time to reestablish care in Texas. R. 312.

On April 24, 2014, Plaintiff was evaluated by consultative psychologist Dr. Michael Morris. R. 372. Plaintiff reported that her primary concern was her depressive symptoms. R. 373. Plaintiff reported that her psychiatric symptoms first began to interfere with her work following her aneurism in 2001, but that her depression worsened after she lost her job in 2011. R. 373. Plaintiff moved to Texas in early March 2014 and was unable to find a low-cost provider so some of her prescriptions ran out. R. 374. Plaintiff reported worsening depression since running out of her medications. R. 374. Plaintiff reported improvement in her hygiene

2

since moving to Texas because her sister and brother-in-law supported and encouraged her. R. 374. While in Texas, Plaintiff was not required to do laundry, chores or yardwork, but helped her sister cook and clean up after meals and accompanied others on shopping trips. R. 374. Plaintiff reported being able to use a phone directory and a computer. R. 375. Plaintiff sometimes spoke with a friend or two on the telephone, but did not otherwise participate in any activities or social gatherings. R. 375. Dr. Morris opined that Plaintiff had mild limitations in attention and concentration, difficulty with short-term memory capacity, and mild problems focusing on tasks during the evaluation. R. 377. Plaintiff exhibited a depressed mood during the interview. R. 377. Dr. Morris made the following conclusion:

> [Dr. Morris] estimates a guarded prognosis[3] for Ms. Edge's bipolar disorder (specifically depressive) symptoms to improve and remit. [Dr. Morris] expects the course of treatment will be long-term and complicated. The claimant reported, and medical records appear to confirm, a history of poor response to treatment.
>
> Based on the current evidence obtained during this examination, Ms. Edge is demonstrating significant limitations in her ability to reason and to make occupational, personal, and social adjustments.

R. 378.

In September 2014, Plaintiff returned to Illinois after her relationship with husband failed. R. 399. On September 19, 2014, Plaintiff saw Nurse Mattei for mental health treatment. R. 399. Plaintiff reported continued symptoms of depression, thoughts of harming herself and her dog, panic attacks, headaches, and anxiety. R. 399. However, Plaintiff was able to maintain some social relationships and was going to church and bible study. R. 399. Plaintiff reported

---

[3] "Guarded prognosis refers to a prognosis given by a physician when the outcome of a patient's illness is in doubt." *Wieringa v. Colvin*, No. 13 C 4998, 2015 U.S. Dist. LEXIS 38718, at *20 n.16 (N.D. Ill. Mar. 26, 2015) (citation omitted).

that the medications she took in Texas did not help. R. 399. Nurse Mattei stated that Plaintiff's "overall response to treatment has been poor." R. 399. Nurse Mattei ruled out bipolar disorder, but assessed Plaintiff as having personality disorder, generalized anxiety disorder and major depressive disorder. R. 400. On November 17, 2014, Nurse Mattei reported that Plaintiff missed her last appointment because she spent a week in Florida with her sister. R. 426. Plaintiff reported feeling better in Florida, but became overwhelmed and depressed when she returned to her house. R. 426. Nurse Mattei noted "ongoing deep depression." R. 426.

On June 30, 2015, a hearing was held before an administrative law judge ("ALJ"). R. 38-71. Plaintiff was then 53 years old. Plaintiff testified that she lived by herself in public housing. R. 44-45. Plaintiff felt overwhelmed by her daily activities, including cooking, bathing and housekeeping. R. 55. She testified that she had a hard time cooking meals for herself and would usually eat prepared, frozen meals and sometimes would not eat at all. R. 45-46, 54. She would also go days without taking a shower. R. 54. She explained that leaving her apartment was very overwhelming and taking her dog for a short walk was the only thing that motivated her to leave the apartment. R. 45, 49. Plaintiff tried to keep her apartment "picked up," but did not do much cleaning. R. 46. Plaintiff drove, but not often. R. 46. Plaintiff was married, but was separated from her husband. R. 47-48. She had two daughters in their late twenties, but had a "strained relationship" with both. R. 48. Plaintiff was a school bus driver for 11 years, but lost her job in 2011 because she did not follow the proper drop-off procedure and also due to poor attendance. R. 41-42, 66, 254.

Plaintiff sought mental health treatment at Crusader Clinic. R. 51. She was taking 3 psychiatric medications, including Abilify, Wellbutrin and Zoloft. R. 51. Plaintiff had been on some combination of psychiatric medications for the past 20 years. R. 52. Plaintiff did not feel like she responded well to the medications because there were so many ups and downs. R. 52.

Plaintiff testified that she suffered from anxiety, self-esteem issues and anti-social behavior resulting from her depression. R. 53-54. Plaintiff confirmed having thoughts about hurting herself and her dog. R. 55.

Dr. Mark Oberlander also testified as an expert in psychology. He questioned Plaintiff about her lack of treatment at the Crusader Clinic during the year before her September 2014 doctor visit. R. 58. Plaintiff explained that she and her husband moved to Texas for 6 months to live with Plaintiff's sister and work on their marriage. R. 59, 62. Dr. Oberlander also noted that Plaintiff's records from Crusader Clinic from October 2014 through May 2015 did not have any updates on Plaintiff's mental health treatment. R. 59.

In formulating his opinion, Dr. Oberlander relied on some information from Dr. Michael Morris' consultative examination from April 2014 (R. 372-78). R. 60. He noted that Plaintiff drove and was taking anti-depressant medication with little response, but reported improvements in activities of daily living when she was in Texas. R. 60. He also noted that Plaintiff did not show any significant interpersonal or social issues and exhibited adaptive functionality during absences from treatment, such as the ability to travel out of state. R. 64. Based on the record, Dr. Oberlander found the following listings at issue: affective disorder, anxiety disorder, personality disorder NOS, and alcohol and drug use. R. 61. Dr. Oberlander opined that Plaintiff retained the functionality to engage in simple, repetitive work with one to three-step instructions, with the ability to concentrate for two hours at a time, with no high stress work assignments or hourly quotas and only occasional contact with others. R. 63-64. Specifically, Dr. Oberlander found that Plaintiff had moderate impairment in activities of daily living, noting that she lived alone and he "would imagine that she exercises some measure of judgment in keeping her place in some measure of order." R. 64-65. He also found moderate impairment in social functioning and concentration, but no periods of decompensation or deterioration. R. 65.

On July 9, 2015, the ALJ issued his opinion, finding Plaintiff not disabled. R. 13-30. The ALJ found that Plaintiff had the following severe impairments: L4-L5, L5-S1 degenerative facet joint hypertrophy; status post-brain aneurysms with complaints of residual headaches; affective, anxiety and personality disorders; and history of alcoholism and cocaine addiction. R. 15. The ALJ determined that Plaintiff's impairments did not meet or medically equal a listed impairment. R. 16. The ALJ concluded that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work with certain restrictions. R. 18.

## II. DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts

6

cannot build the logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 U.S. Dist. LEXIS 152938, at \*19 (N.D. Ill. Oct. 29, 2014).

On appeal, Plaintiff argues that the ALJ failed to properly assess Plaintiff's credibility and evaluate the opinions from Dr. Morris and Nurse Mattei. In particular, Plaintiff argues that the ALJ failed to weigh Dr. Morris' consultative examination opinion, despite regulations explicitly requiring ALJs to do so. An ALJ is not only required to evaluate every medical opinion in the record (20 C.F.R. § 404.1527(c)), but he must do so by applying the checklist of six factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6).[4] *See also* 20 C.F.R. § 404.1527(e)(2)(ii) (requiring ALJ to evaluate psychological consultant's opinion using the checklist factors). This Court has previously found that the failure to explicitly apply the checklist is grounds for remand. *See Duran v. Colvin*, No. 13 CV 50316, 2015 U.S. Dist. LEXIS 101352, at \*32-33 (N.D. Ill. Aug. 4, 2015).

The Commissioner admits that the ALJ did not explicitly weigh Dr. Morris' opinion, but argues that the error was harmless because the ALJ nevertheless evaluated and considered Dr. Morris' opinion, which was consistent with Dr. Oberlander's and the ALJ's findings and conclusions. This Court disagrees. The ALJ may have referenced Dr. Morris' opinion, but did so only as part of a lengthy, chronological recitation of all the medical evidence in the record. *See* R. 19-25. *See Chuk v. Colvin*, No. 14 C 2525, 2015 U.S. Dist. LEXIS 147626, at \*25 (N.D. Ill. Oct. 30, 2015) ("[S]ummarizing a medical history is not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion."). The ALJ provided no evaluation or analysis of Dr. Morris' opinion. By contrast, the ALJ explicitly evaluated Dr. Oberlander's

---

[4] These factors are: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).

opinion and gave it "great weight" after evaluating several checklist factors.  R. 27-28.  The ALJ even noted that non-examining sources are generally entitled to less weight than those of an examining source, yet his evaluation never mentioned Dr. Morris.  R. 27-28.

The Court cannot find this error harmless because it is unclear from the decision whether the ALJ considered Dr. Morris' opinion or how it factored into the RFC determination.  It may be that the ALJ considered Dr. Morris' determination that Plaintiff's treatment was expected to be long-term and complicated and that she had significant limitations and still determined that Plaintiff had the capacity to perform work with certain restrictions.  But this cannot be determined from the record before the Court because the ALJ adopted Dr. Oberlander's findings without any reference or evaluation of Dr. Morris' opinion.

There may be some overlap between Dr. Morris' findings and those of Dr. Oberlander, which the ALJ used in determining the RFC.  This includes Plaintiff's mild limitations in attention and concentration, difficulty with short-term memory capacity, and mild problems focusing on tasks.  R. 377.  But portions of Dr. Morris' opinion are left unaddressed by both Dr. Oberlander and the ALJ.  Primarily, the ALJ failed to explain how Plaintiff would be able to perform full-time employment, even with restrictions, in light of Dr. Morris' finding that Plaintiff's depressive symptoms improved and remitted.  Dr. Morris also found that Plaintiff did not respond well to treatment, resulting in significant limitations in her ability to reason and to make occupational, personal, and social adjustments.  This is further supported by the fact that Plaintiff's depression caused her to miss so many days at her previous job that it "was pretty much a part-time job," even though she worked only a few hours in the morning and afternoon and had the summers off.  R. 373.  Plaintiff was ultimately fired from this job, in part, due to her absences.

Dr. Oberlander also found that Plaintiff had only moderate impairment in activities of daily living, noting that she lived alone and he "would imagine that she exercises some measure of judgment in keeping her place in some measure of order." R. 64-65. He does not address Dr. Morris' finding that Plaintiff was significantly limited in her ability to make personal adjustments or her testimony and reports that she was overwhelmed by daily activities and sometimes did not eat, sleep or do self-care. R. 54, 316. The Commissioner points to several records that addressed Plaintiff's improvement to argue that the ALJ properly determined that Dr. Oberlander's opinions were well supported. Defendant's Memorandum at 6, Dkt. 18.

However, the ALJ did not discuss the records referenced by the Commissioner. The ALJ merely included them in his chronology of the medical evidence. Moreover, the records cited by the Commissioner reveal Plaintiff's improvements, but leave out evidence that Plaintiff continued to struggle with her depression. The Commissioner points to a May 2014 physical consultative examination where Plaintiff denied feeling overwhelmed or having stress and panic attacks. R. 383. Yet in the same record, Plaintiff reported feeling depressed and having excessive worry or anxiety. In September 2014, Plaintiff reportedly continued attending church and bible study, but also stated that her anxiety made it difficult for her to leave the house. R. 399. In October 2014, a medical record reported that Plaintiff had "Moderate Depression," but this physician was not treating Plaintiff for mental health and Plaintiff's mental health counselor in November 2014 assessed her with "ongoing deep depression." R. 426.

Reading the record as a whole, it reveals that Plaintiff's mental impairments were episodic and she had a long history of treatment, which providers reported she did not respond well to. *See Wieringa v. Colvin*, No. 13 C 4998, 2015 U.S. Dist. LEXIS 38718, at *20 (N.D. Ill. Mar. 26, 2015) ("Because mental illness tends to be episodic, the ALJ cannot extrapolate from days where Plaintiff seems to be doing better to conclude that she has improved her condition.");

9

*Fuchs v. Astrue*, 873 F. Supp. 2d 959, 972 (N.D. Ill. 2012) (same). Even Dr. Morris' evaluation, which found Plaintiff's bipolar disorder significantly limiting, was performed when Plaintiff was arguably doing better because she was living in Texas with her sister and brother-in-law, who supported and encouraged her. R. 375. Plaintiff did have brief periods of improvement, such as when she visited Florida, but she became overwhelmed and depressed when she returned home. R. 426. The Court is not referencing this evidence to say that Dr. Oberlander's opinion and the ALJ's ultimate determination cannot be supported by the evidence in the record. However, the ALJ must articulate his reasoning. Without addressing the evidence contrary to Dr. Oberlander's opinions and the RFC determination, it is unclear whether the ALJ properly considered the record as a whole.

The Commissioner also seems to argue that the ALJ's RFC determination is supported by substantial evidence because the ALJ properly relied on Dr. Oberlander's opinion, which in turn relied on Dr. Morris' findings in assessing Plaintiff's limitations. This argument is similarly unavailing. Although Dr. Oberlander's testimony included the line "[r]elying on consultative sources [] Dr. Morris," he merely referenced Dr. Morris' observations about Plaintiff's reported activities and history without any analysis of Dr. Morris' evaluation of Plaintiff's mental health and limitations. R. 60, 63-64. The only analysis Dr. Oberlander provided was that he seemed to agree with Dr. Morris' diagnosis of bipolar disorder because Dr. Rizvi provided a "confirmatory" diagnosis. R. 60-61. But he also noted that Dr. Rizvi made "no change in medications" when he managed Plaintiff's prescriptions. R. 60-61. Dr. Rizvi's notes, however, indicate that he changed and increased Plaintiff's prescriptions at each visit from October 2013 through January 2014. R. 301-05. Despite this contradiction, it is unclear exactly how Dr. Oberlander used this evidence in evaluating Plaintiff's limitations because, like the ALJ, he did not articulate his reasoning. Regardless, the ALJ may not merely leave Dr. Morris' findings

10

unaddressed because they were mentioned in an opinion he considered. ALJs are required to

"[e]valuate each medical opinion together with the rest of the relevant evidence to determine

which findings are best supported by the evidence, and whether additional development is

needed." POMS DI 24515.002(A)(6).

As an additional ground for remand, Plaintiff argues that the ALJ improperly assessed her

credibility. An ALJ's credibility determination should be reversed only if it is patently wrong.

*Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be

reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing

specific reasons supported by the record." *Id.; Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)

(a credibility finding "must be specific enough to enable the claimant and a reviewing body to

understand the reasoning").

The ALJ discredited Plaintiff's alleged limitations based on her reported activities, delay

in seeking treatment after her alleged onset date, lack of medical evidence and treatment to

support her back impairment and headaches, and lack of emergency visits and compliance with

medications for her mental health impairments. R. 26-27. The Court finds that the ALJ's

credibility determination is not supported by substantial evidence for several reasons. In light of

the need to remand for a more explicit analysis regarding opinion evidence, the ALJ should also

take the opportunity to clearly explain and support his reasons for discrediting Plaintiff,

especially in light of new guidance for credibility determinations in the regulations. *See* Social

Security Ruling 16-3p.

In determining Plaintiff's credibility, the ALJ relied in part on Plaintiff's failure to seek

treatment until August 2013 and mental health treatment until October 2013,[5] despite an onset

---

[5] The Commissioner also points to a gap in Plaintiff's mental health treatment from late 2014 until the
middle of 2015. Dr. Oberlander attempted to ask Plaintiff why there were no mental health updates in

date of January 2012. The ALJ asserted that the lack of treatment "suggests that the symptoms

may not have been as serious as has been alleged in connection with" her disability application.

R. 26. It is true that the first mental health treatment visit in the record was from October 2013.

What the ALJ failed to address was that Plaintiff testified to being on psychiatric medications for

the past 20 years and that she was already taking antidepressant medication when she first

established care at Crusader Clinic in August 2013.[6] Lack of treatment is a significant factor in

an ALJ's decision, but an ALJ is required to question Plaintiff about it and evaluate her

explanations instead of addressing it for the first time in the written decision. *See* SSR 16-3p

("We will not find an individual's symptoms inconsistent with the evidence in the record [based

on the frequency or extent of treatment sought] without considering possible reasons he or she

may not comply with treatment or seek treatment consistent with the degree of his or her

complaints.").

In particular, the regulations advise that "[p]ersistent attempts to obtain relief of

symptoms, such as increasing dosages and changing medications, trying a variety of treatments,

referrals to specialists, or changing treatment sources may be an indication that an individual's

symptoms are a source of distress and may show that they are intense and persistent." SSR 16-

3p. Plaintiff has had a long-term struggle with depression and has reported a poor response to

treatment in the past. Based on this evidence and the episodic nature of mental illness, the ALJ

should have at least questioned Plaintiff about the reasons for her gap in treatment. *See Shauger

v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the

failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first

---

2015, but he never allowed Plaintiff to answer the somewhat rhetorical question and the ALJ never
followed up. R. 59.
[6] R. 329 (listing Plaintiff's current medications to include Mirtazapine.); R. 327 ("Treated with
Mirtazapine since February 2013. Has been treated with multiple other antidepressants as well. States
that 'it seems that the antidepressants work for a while and then wear off.'").

explore the claimant's reasons for the lack of medical care before drawing a negative inference."). Moreover, there was evidence in the record that Plaintiff lacked insurance and could not afford treatment during much of this period,[7] which may have contributed to her lack of consistent treatment. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) ("[A]lthough the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.").

The ALJ also discredited Plaintiff due to a lack of emergency visits for her depression and anxiety. The record is devoid of any emergency that required Plaintiff to meet with her counselor or physician for her mental health impairments. Nevertheless, the ALJ points to no evidence or opinion that emergency visits are required for Plaintiff to demonstrate the severity of her limitations related to her depression or anxiety.

Of similar concern is the ALJ's statement that Plaintiff was "not entirely compliant in taking prescribed psychiatric medications." R. 27. The ALJ did not cite to Plaintiff's alleged noncompliance, but merely referred to his chronological recitation of the medical evidence. The Commissioner points to one example from January 29, 2014, where Plaintiff reported that she ran out of Trileptal over a week before the visit. R. 316. Plaintiff stated that she understood the importance of taking her medications and said she would pick it up the following day. R. 316. This was the only example provided to support Plaintiff's noncompliance. It seems unreasonable to discredit Plaintiff's testimony based on one instance of failing to fill a prescription, especially during a period when Plaintiff had no insurance. *See* R. 316 ("Insurance: Self Pay").

---

[7] R. 312-19, 329, 402 (indicating that Plaintiff had no insurance from January 2013 through February 2014 and later received Medicaid in September 2014"); R. 51 (testifying that she was unable to seek treatment for her back because she owed the provider money).

The ALJ also pointed to activities of daily living that undermined Plaintiff's claim of disabling functional limitations. While some of the evidence the ALJ cites does reflect Plaintiff's ability to perform activities of daily living, such as traveling and socializing, this is only a snapshot of Plaintiff's records. As stated above, the record as a whole shows that Plaintiff had ups and downs related to her illness. For example, Plaintiff testified that she felt overwhelmed by daily activities, including leaving her apartment, but that her dog was the only thing that motivated her to leave the apartment. R. 45, 55. However, Plaintiff's testimony and more recent records showed she had feelings of hurting herself and her dog. R. 55, 399. Plaintiff even reported periods where she did not eat, sleep or do self-care. R. 54, 316. The Court is not opining on Plaintiff's credibility based on this evidence, but solely on the ALJ's lack of analysis. On remand, the ALJ should make sure to address these records so that his decision clearly reflects a thorough review of the record.

### IV. CONCLUSION

For the reasons stated in this opinion, Plaintiff's motion for summary judgment (Dkt. 12) is granted, and the Commissioner's motion (Dkt. 18) is denied. The decision of the ALJ is remanded for further proceedings consistent with this opinion.


Date: February 21, 2017                    By:    _____
                                                  Iain D. Johnston
                                                  United States Magistrate Judge